PAINE, WEBBER, JACKSON & CURTIS, INC., Plaintiff,

v.

MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., Defendant, Counterclaimant, and Third-Party Plaintiff,

v.

DEAN WITTER REYNOLDS, INC., Third-Party Defendant.

Civ. A. No. 82–680.

United States District Court,
D. Delaware.

May 27, 1983.

As Amended June 21, 1983.

Alan T. Boyd of Bayard, Brill & Handelman, P.A., Wilmington, Del., Kenneth E. Madsen, Richard L. Mayer and James Galbraith of Kenyon & Kenyon, New York City, of counsel, for plaintiff.

Rudolf E. Hutz and James M. Mulligan of Connolly, Bove, Lodge & Hutz, Wilmington, Del., Stephen B. Judlowe of Hopgood, Calimafde, Kalil, Blaustein & Judlowe and James W. Grady, Jr., New York City, of counsel, for defendant.

Robert K. Payson of Potter, Anderson & Corroon, Wilmington, Del., Reed E. Hundt and Peter L. Winik of Latham, Watkins & Hills, Washington, D.C., James G. Hunter, Jr., of Latham, Watkins, Hedlund, Hunter & Lynch, Chicago, Ill., of counsel, for third-party defendant.

William Leighton, pro se, New York City.

## OPINION

LATCHUM, Chief Judge.

Plaintiff, Paine, Webber, Jackson and Curtis, Inc. ("Paine Webber"), brings this action pursuant to 28 U.S.C. §§ 2201–2202 and Rule 57, Fed.R.Civ.P.,[1] seeking a declar-

---

1. Jurisdiction exists by virtue of 35 U.S.C. § 271 and 28 U.S.C. § 1338. Venue is proper pursuant to 28 U.S.C. § 1400(b).

atory judgment of noninfringement, invalidity and unenforceability of United States Patent No. 4,346,442 ("the '442 patent"), and ancillary injunctive relief against defendant Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch"), from initiating infringement litigation against and/or charging Paine Webber or any of its customers, officers, directors or employees with the infringement of the '442 patent. Merrill Lynch has counterclaimed seeking injunctive relief against Paine Webber for infringing or contributing to infringe the '442 patent, and monetary damages for Paine Webber's infringing activities. Merrill Lynch also has filed a third-party complaint against third-party defendant Dean Witter Reynolds, Inc. ("Dean Witter"), alleging that it has infringed and continues to infringe the '442 patent by making, using and selling an implementation of the '442 patent and seeks injunctive relief against Dean Witter to enjoin the infringing, inducing infringement or contributing to infringe the '442 patent. Merrill Lynch also alleges that Dean Witter has wrongfully appropriated the trade secrets of Merrill Lynch when it hired one of Merrill Lynch's employees. It requests this Court to exercise its pendent jurisdiction to enjoin Dean Witter from misusing the trade secrets allegedly misappropriated.

Paine Webber has moved this Court pursuant to Rule 56(c), Fed.R.Civ.P., for a summary judgment declaring the '442 patent invalid and unenforceable under 35 U.S.C. § 101 on the sole ground that the patent does not claim subject matter which can form the basis for a valid patent. (Docket Item ["D.I."] 12.) Paine Webber also has moved this Court (1) to strike so much of Merrill Lynch's "Answer, Counterclaim, Third Party Complaint and Jury Demand" as is denominated "Third Party Complaint," on the ground that the Third Party Complaint does not comply with the provisions of Rule 14, Fed.R.Civ.P.; or (2) to dismiss, or alternatively to sever, so much of the Third Party Complaint on the grounds that the attempted joinder of the third party does not comply with the provisions of Rules 13(h), 19 or 20.

Dean Witter has moved this Court, pursuant to Rules 12(b)(1) & (6), Fed.R.Civ.P., for an order dismissing each cause of action alleged by Merrill Lynch on the grounds that (1) the first cause of action fails to state a claim upon which relief can be granted because the '442 patent is invalid and unenforceable under Section 101, and that (2) the second cause of action alleging trade secrets misappropriation should be dismissed for lack of subject matter jurisdiction.

William Leighton d/b/a Option Advisory Service, Inc. ("Leighton") also has moved pursuant to Rules 19 and 21 as a *pro se* litigant to join Leighton as a third party plaintiff. Leighton requests this Court to declare the '442 patent invalid and unenforceable and hold Merrill Lynch liable for unfair competition for its use of the '442 patent.

## I. The Cash Management Account

In 1977 Merrill Lynch offered to the public the Cash Management Account program ("CMA") which combined three financial services commonly offered by financial institutions and brokerage houses and included a brokerage security account (the "Securities Account"), several money market funds (the "Money Market Fund"), and a charge/checking account (the "Visa Account"). The Securities Account, the primary component of the CMA program, is a conventional Merrill Lynch margin account which may be used to purchase and sell securities and options on margin or on a fully-paid basis. It is maintained pursuant to the rules and regulations of the Securities and Exchange Commission, the Board of Governors of the Federal Reserve System, the New York Stock Exchange, and the National Association of Securities Dealers, Inc. As is the case with a conventional margin account, the customer of the CMA pays normal brokerage fees for securities transactions in the Securities Account. (D.I. 13A, CMA Money Trust Prospectus at 2.)

The Money Market Fund is a conventional money market fund which provides the customer of the CMA with a choice of three CMA money market funds: the CMA Mon-

ey Fund, the CMA Government Securities Funds, or the CMA Tax-Exempt Fund. Each of these funds is a no-load, diversified, open-end management investment company registered under the Investment Company Act. The objectives of the funds are similar to the objectives of other money market funds (such as the Merrill Lynch Ready Assets Trusts). Each seek the safety of principal, liquidity and current income available from investing in a portfolio of money market securities. Dividends are declared daily and automatically reinvested in the Money Market Fund similar to the method by which the dividends are distributed, and reinvested in other money market funds. (*Id.*)

The Visa Account is the third component of the CMA and is managed by Bank One of Columbus, N.A. ("Bank One"). Bank One issues a Visa card and checks to each person who is a CMA customer. The card may be used to make purchases of merchandise or services at Visa-participating establishments or to obtain cash advances from any Visa-participating bank or branch. The CMA customer may draw checks upon his Visa Account for any purpose and the Visa card is similar to the conventional card in that the card is honored at more than the 100,000 worldwide bank branches in the Visa system, as well as the 3,000,000 business establishments accepting the Visa card. (*Id.* at 3.)

No question exists that the three major components of the CMA were offered to the public prior to the marketing of the CMA by financial institutions and/or brokerage houses: one could have placed securities into a brokerage account, purchased shares in a money market fund, or obtained a Visa charge account. Merrill Lynch, however, argues that by combining the three components of the CMA, the customer receives synergistic benefits. According to Merrill Lynch, one of the advantages of the CMA is that all money generated in the Securities Account is automatically invested within a week into the Money Market Fund. This differs from a conventional brokerage account, which might not invest money generated from activity in the brokerage account and thus some money might remain in an account without yielding any financial return. These proceeds, referred to as "idle cash" do not enhance the customer's portfolio and usually is not compatible with the customer's overall financial objectives. By investing any idle cash generated in the Securities Account, into the Money Market Fund, the customer apparently receives a greater return on his initial investment and therefore is consistent with the customer's overall objectives.

Another advantage of having an integrated financial service, as provided by the CMA, is that the cash balances in the Securities Account, shares in the Money Market Fund, and available margin loan value of the securities in the Securities Account are calculated when determining the amount of credit available in the Visa Account. Also, payments made by Merrill Lynch to Bank One in payment of Visa balances, on behalf of the CMA customers, are made in the following order of priority: (1) from the cash balances, if any held in the Securities Account; (2) from the proceeds of redemption of Money Fund shares in CMA accounts; and (3) from margin loans to the customer by Merrill Lynch within the available margin loan value of the securities in the Securities Account. This system of priority arguably provides for an efficient use of funds because the customer will not incur the cost of a margin loan until all free credit cash balances and funds invested in Money Market Fund shares are fully utilized. (*Id.*)

Another advantage of the CMA, according to Merrill Lynch, is that those customers who subscribe to the CMA receive a monthly transaction statement from Merrill Lynch which details all CMA transactions during the preceding month. The statement describes securities and options bought and sold in the Securities Account, whether on margin or on a fully-paid basis, any other type of transaction effected in the Securities Account, margin interest charges, if any, Money Market Fund shares that were purchased or redeemed, dividends on Money Market Fund shares, purchases of merchandise or services that were made with the Visa card, checks drawn against the Visa Account and cash advances. (*Id.*)

## II. *The Invention*

### A. *The Patent Office*

The '442 patent application was filed in the United States Patent Office on July 29, 1980 asserting twelve claims for a "Securities Brokerage-Cash Management System." With the application, Merrill Lynch notified the Patent Office that a portion of the system had been used and had been described in the CMA Money Trust-Prospectus, dated August 25, 1978 and a brochure distributed by Merrill Lynch entitled "Merrill Lynch Cash Management Account," published October 1978 by Merrill Lynch, and that these documents were distributed more than one year prior to the filing of the '442 patent application. On October 2, 1981, the Examiner rejected all twelve claims on the grounds that all the claims were obvious under Section 103, and that Claims 1–6 and 12 were not adequately described under Section 112:

> Claims 1–12 are rejected under 35 U.S.C. 103 as obvious over the CMA Money Trust Prospectus which was cited by applicant. The features recited in claims 1, 3, 4 and 6 are either inherently present in the description of the CMA Money Trust or would be clearly obvious in any system needed to carry out the functions of the Trust. The use of an anti-kiting means is considered to be an obvious design expedient in any system dealing with market transactions. It is conventional in financial systems in maintaining a cross-reference file to indicate acceptable customers and transactions. The method claims are obvious in similar manner. These claims would be obvious to one of ordinary skill in the art in view of the features described in the CMA Money Trust Prospectus.

> Claims 1–6 and 12 are additionally rejected under 35 U.S.C. 112, second paragraph, for failing to particularly point out and distinctly claim the invention. In claims 1 and 2 line 15–16, there is no antecedent basis for the phrase "said information storing and verifying means."

Also in claims 1 and 2, the output of the means for generating an updated credit limit is not used elsewhere in the claims. It should be sent to the bank or something. Claims 3–6 incorporate these errors. In Claim 12 line 9, there is no antecedent basis for the phrase "said account balance difference computing means." Appropriate correction or clarification of these errors is required.

> Claims 5, 6, 11 and 12 are objected to as being improper multiple dependent claims. A multiple dependent claim cannot depend from or through another multiple dependent claim.

(D.I. 13A at 91.) On January 4, 1982, the '442 patent application was amended. It cancelled claims 7–12 inclusive, thus leaving claims 1–6. Further it substituted certain terminology in each of the remaining claims in an attempt to overcome the Section 112 rejection. Further in response to the Section 103 objection, Merrill Lynch maintained that the claims in the '442 application were more complex than the prior art and that it would be virtually impossible for one skilled in the art to duplicate the CMA System by using only the information in the Prospectus and Brochure without resorting to the use of a large staff, personal innovation and problem-solving by members of that staff, and a major program of experimentation and testing. Furthermore, Merrill Lynch represented to the Examiner that even given all of the above, it would be uncertain that the results called for in the claims could be achieved.

### B. *The '442 Patent*

On August 24, 1982, the United States Patent and Trademark Office ("PTO") issued the '442 patent for a Securities Brokerage-Cash Management System on the six remaining claims. Merrill Lynch is the assignee of the patent. The '442 patent relates to the CMA, and more specifically, to the data processing methodology and apparatus for effecting the CMA. The specifications of the '442 patent primarily teach the schematic flow chart for the CMA,[2] but

---

**2.** A flow chart is a graphical representation of the fundamental idea for solving a problem, and is the first expression of the programmer's ideas, and breaks down a given problem by determining the sequence the data is to be

do not include any descriptions of any apparatus to effectuate the CMA.

Claims 1 and 3 are illustrative of the six claims set forth in the '442 patent:

1. In combination in a system for processing and supervising a plurality of composite subscriber accounts each comprising a margin brokerage account, a charge card and checks administered by a first institution, and participation in at least one short term investment, administered by a second institution, said system including brokerage account data file means for storing current information characterizing each subscriber margin brokerage account of the second institution, manual entry means for entering short term investment orders in the second institution, data receiving and verifying means for receiving and verifying charge card and check transactions from said first institution and short term investment orders from said manual entry means, means responsive to said brokerage account data file means and said data receiving and verifying means for generating an updated credit limit for each account, short term investment updating means responsive to said brokerage account data file means and said data receiving and verifying means for selectively generating short term investment

transactions as required to generate and invest proceeds for subscribers' accounts, wherein said system includes plural such short term investments, said system further comprising means responsive to said short term updating means for allocating said short term investment transactions among said plural short term investments, communicating means to communicate said updated credit limit for each account to said first institution.

\* \* \* \* \* \*

3. A combination as in claim 1 or 2 where said updated credit limit generating means comprises means for accumulating the amount of charge card usage and checks for each subscriber, means responsive to said brokerage account data file means for generating a subscriber updated credit limit measured by the difference between the limiting residual subscriber brokerage account securities loan value augmented by the value of the subscriber's short term investment, decremented by the value of the subscriber's aggregate expenditures and funds required for brokerage account purposes, means for reporting said updated credit limit to said brokerage account data file means.

operated upon by the computer. 21 Cath.U. L.R. 181, 182 (1971). The fundamental idea represented by the flow chart is known as an algorithm and is capable of being expressed in differing forms and by differing symbolizations. The flow chart is not literally a computer program, but a diagram of the logical operations that will be performed by the computer. 11 Hofstra L.R. 329, 341 (1982).

The flow chart, thus, is only the first step in the development of the computer program. The second step in the development of a computer program is the creation of the source program. The source program is generally regarded as the alphanumeric translation of the flow chart idea into the problem-oriented computer language; that is, FORTRAN, COBOL, or ALGOL, and may be punched on a deck of cards or imprinted on discs, tapes or drums. The final step in the completion of a computer program is the development of the object program. In this step, the programmer completes the translation of the flow chart idea into the machine language. Object programs stored in a Read Only Memory ("ROM"), or other memo-

ry device, are manifested by a binary representation composed of electrical or magnetic bits (abbreviation for Binary digIT) which are either on (1) or off (o). It is impossible for a skilled person, unaided by a machine, to read this program. With a proper machine, however, the program statements can be "read out" in their binary/machine language form. *See* 30 Ala.L.Rev. 527, 530–32 (1979).

The CCPA has stated that:

"writing a computer program may be a task requiring the most sublime of the inventive faculty or it may require only the droning of clerical skill. The difference between the two extremes lies in the creation of mathematical methodology to bridge the gap between the information one starts with (the "input") and the information that is desired (the "output"). If these bridge-gapping tools are disclosed [and satisfies the tests for patentability] there would seem to be no cogent reason to require disclosure of the several tools known to all who practice the art."

*Matter of Application of Sherwood,* 613 F.2d 809, 817 (Cust. & Pat.App.1980).

As claims 1 & 3 demonstrate, the claims of the '442 patent are directed to the CMA system described in the specifications. Unlike the specifications, and for the purpose of the present motions, the various elements of the claims are cast in terms of apparatus, that is, "means for" performing certain tasks or steps, rather than in terms of the method steps themselves.[3]

### III. *Paine Webber Contentions*

Paine Webber contends that the '442 patent is invalid under 35 U.S.C. § 101 because it does not claim a "process, machine, manufacture or composition of matter" as required by Section 101. It argues that the '442 patent is unpatentable because the claims "define nothing more than the combination of familiar business systems, that is, a margin brokerage account, one or more money market funds, and a checking/charge account, which have been connected together so that financial information can be exchanged among them." (D.I. 13 at 7–8.) It argues that business methods and systems cannot form the subject matter of a valid patent monopoly and that courts do not hesitate to invalidate patents on the grounds that they merely describe business systems. *See Loew's Drive-In Theatres, Inc. v. Park-In Theatres, Inc.,* 174 F.2d 547, 552 (1st Cir.1949); *In re Patton,* 127 F.2d 324, 327 (Cust. & Pat.App.1942); *Hotel Security Checking Co. v. Lorraine Co.,* 160 F. 467, 470 (2d Cir.1908); *Berardini v. Tocci,* 190 F. 329 (S.D.N.Y.1911), *aff'd,* 200 F. 1021 (2d Cir.1912); *United States Credit System Co. v. American Credit Indemnity Co.,* 53 F. 818, 819 (S.D.N.Y.), *aff'd,* 59 F. 139 (2d Cir.1893).

According to Paine Webber, in an attempt to obscure the fact that the invention is merely a business system, the claims were drafted to recite a combination of various "means" for performing certain functions. Paine Webber argues that the specifications do not refer to any apparatus, but merely describe a method, and thus the claims of the '442 patent are limited to the method described in the specifications. According to Paine Webber, the "means" portions of the claims thereby refer only to the functional steps rather than to specific apparatus or structure and that the method claimed merely describes a series of manipulative steps that can be performed by hand with the aid of paper, pencil and telephone. Therefore Paine Webber maintains that the claims and the specifications of the '442 patent reveal that the invention fits squarely into the business system category and has nothing to do with machinery, technology, process, manufacture, or composition of matter. (D.I. 13 at 10.)

Merrill Lynch, however, argues that the "means plus function" form of the claims in the '442 patent is recognized under 35 U.S.C. § 112 which provides:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

It asserts that courts have repeatedly held that further specification is not required to establish an apparatus claim (citing *In re Sherwood,* 613 F.2d 809, 811 (Cust. & Pat. App.1980)). Merrill Lynch, therefore, contends that no requirement exists to identify any apparatus in the specifications in order to claim a valid "means for" apparatus claim.

---

**3.** For example, Claim 1 recites "brokerage account data file means for storing current information characterizing each subscriber's margin brokerage account," "manual entry means for entering short term investment orders in the second institution," "data receiving and verifying means for receiving and verifying charge card and check transactions from said first institution and short term investment order from said manual entry means," "means responsive to said brokerage account data file means and said data receiving and verifying means for generating an updated credit limit for each account," and "communicating means to communicate said updated credit limit for each account to said first institution." Merrill Lynch argues that each of these phrases recite language defining specific physical apparatus to be used to implement the CMA. The Court does not address, in this motion, whether these phrases define an apparatus claim.

■ The Court need not determine, at this time, whether the '442 patent claims an apparatus or a process because labels are not determinative in a Section 101 analysis. *See Application of Maucorps,* 609 F.2d 481, 485 (Cust. & Pat.App.1979); *Application of Gelnovatch,* 595 F.2d 32, 37 (Cust. & Pat. App.1979). In *Maucorps,* the Court of Customs and Patent Appeals ("CCPA") noted that whether an invention is claimed as an apparatus or process is often an exercise in drafting and that those principles used to determine whether a patent claims statutory subject matter equally applies whether an invention is claimed as an apparatus or process. Accordingly, whether the '442 patent claims a process or an apparatus, is not relevant in a Section 101 analysis; the Court must determine as a threshold matter whether the claims include statutory matter, regardless of the label of the claims.[4]

IV. *Section 101*

A. *Algorithm*

Section 101 enumerates the categories into which inventions must fall to qualify for patent protection: "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent." An invention not falling within one of these four classes is deemed nonstatutory subject matter and is not eligible for patent protection. The phrase "whoever invents" requires that the claimed invention be man-made and lays the foundation for the doctrine that phenomena of nature, mental process and abstract intellectual concepts are not patentable because they are not the basic tools

of technology. *Gottschalk v. Benson,* 409 U.S. 63, 67, 93 S.Ct. 253, 255, 34 L.Ed.2d 273 (1972). Thus if a computer program is viewed as a series of thought processes, then it merely consists of mental steps which is nonstatutory subject matter and not patentable. This view has not been accepted and computer programs are recognized as being patentable.

■ Although a computer program is recognized to be patentable, it must nevertheless meet the same requirements as other inventions in order to qualify for patent protection. For example, the Pythagorean theorem (a geometric theorem which states that the square of the length of the hypotenuse of a right triangle equals the sum of the squares of the lengths of the two sides—also expressed $A^2 + B^2 = C^2$) is not patentable because it defines a mathematical formula. Likewise a computer program which does no more than apply the theorem to a set of numbers is not patentable. The Supreme Court and the CCPA has clearly stated that a mathematical algorithmic formula is merely an idea and not patentable unless there is a new application of the idea to a new and useful end. *See Gottschalk v. Benson,*[5] 409 U.S. 63, 93 S.Ct. 253, 34 L.Ed.2d 273 (1972); *In re Pardo,* 684 F.2d 912 (Cust. & Pat.App.1982).

Unfortunately, the term "algorithm" has been a source of confusion which stems from different uses of the term in the related, but distinct fields of mathematics and computer science. In mathematics, the word algorithm has attained the meaning of recursive computational procedure and appears in notational language, defining a

---

**4.** The Patent Act of 1952 has three sections which define the requirements an invention must meet to be patentable. Section 101 deals with subject matter patentability. Section 102 requires that the invention be novel and Section 103 mandates that the invention not be obvious "to a person having ordinary skill in the art to which said subject matter pertains." Paine Webber moves this Court for summary judgment *only* on the grounds that the subject matter of the '442 patent is not patentable under Section 101.

**5.** In *Benson,* the patent claimed a method of programming a general purpose digital comput-

er to convert signals from binary-coded decimal form into pure binary form. The procedure set forth in the claims provided a generalized formulation to solve the mathematical problem of converting one form of numerical representations to another. The Court stated that the mathematical formula was an algorithm and that an algorithm is merely an idea, if there is no application of the idea to a new and useful end. Thus *Benson* established the principle that an algorithm, in the mathematical sense of the word, cannot without a specific application to a new and useful end be patentable.

computational course of events which is self contained, for example, $A^2 + B^2 = C^2$. In contrast, the computer algorithm is a procedure consisting of operation to combine data, mathematical principles and equipment for the purpose of interpreting and/or acting upon a certain data input. In comparison to the mathematical algorithm, which is self-contained, the computer algorithm must be applied to the solution of a specific problem. *See* J. Goodman, *An Economic Analysis of the Policy Implications of Granting Patent Protection for Computer Programs* (scheduled for publication Vand. L.Rev. (Nov.1983)). Although one may devise a computer algorithm for the Pythagorean theorem, it is the step-by-step process which instructs the computer to solve the theorem which is the algorithm, rather than the theorem itself.

The confusion that has resulted by the dual definition of the term "algorithm" has been exemplified by the different findings by the PTO and CCPA. The PTO, in the past, has had the tendency to hold that a computer program, which is expressed in numerical expression, is not statutory subject matter and thus unpatentable because the computer program is inherently an algorithm. *See In Application of Toma,* 575 F.2d 872 (Cust. & Pat.App.1978); *In Application of Phillips,* 608 F.2d 879 (Cust. & Pat.App.1979); *In re Pardo,* 684 F.2d 912 (Cust. & Pat.App.1982). The CCPA, however, has reversed the findings of the PTO and held that a computer algorithm, as opposed to a mathematical algorithm, is patentable subject matter.

For example, in *Toma, supra,* the invention involved a method of operating a digital computer to translate a source natural language (i.e. Russian) to a target natural language (i.e. English). The PTO issued a Section 101 rejection relying on *Benson* because it believed that the program, which was expressed in a series of mathematical expressions, was an algorithm. It relied upon the broad definition of algorithm recognized within the computer industry and found in C. Sipple and C. Sipple, Computer

Dictionary and Handbook 23 (2d ed. 1975), which provided that an algorithm is:

1) A fixed step-by-step procedure for accomplishing a given result; usually a simplified procedure for solving a complex problem, also a full statement of a finite number of steps.

2) A defined process or set of rules that leads [sic] and assures development of a desired output from a given input. A sequence of formulas and/or algebraic/logical steps to calculate or determine a given task; processing rules.

It therefore concluded that the Supreme Court's use of the term algorithm in *Benson* was not limited to those algorithms expressing pure mathematical formula, but rather included expressions in natural language and that the absence of mathematical notation or activity in the claims did not significantly distinguish those claims from the subject matter in *Benson.* 575 F.2d at 876.

The CCPA, however, rejected the broad definition of algorithm given by the PTO.[6] The Court stated that *Benson* used the term "algorithm" narrowly, to include only those procedures for solving a given type of mathematical problem. It then evaluated the claims in the patent and concluded that the claims did not claim an algorithm because there was no procedure for solving a mathematical problem:

[T]he *Benson* Court used the term "algorithm" in a specific sense, namely, "a procedure for solving a given type of mathematical problem." ... Using this definition, we have carefully examined the claims in this case and are unable to find any direct or indirect recitation of a procedure for solving a *mathematical* problem. Translating between natural languages is not a mathematical problem as we understand the term to have been used in *Benson.* Nor are any of the recited steps in the claims mere procedures for solving mathematical problems. Since the claims do not directly or indirectly recite an algorithm, the claims can-

**6.** The Supreme Court in *Diamond v. Diehr,* 450 U.S. 175, 186 n. 9, 101 S.Ct. 1048, 1056 n. 9, 67 L.Ed.2d 155 (1981), also rejected the broad definition of algorithm. *See also In re Pardo, supra,* 684 F.2d at 615 n. 4.

**1368**

not preempt an algorithm. We hold, therefore, that the claims in this appeal are not rendered nonstatutory by *Benson. Id.* at 877.[7]

The PTO also rejected the invention in the *Application of Phillips,* 608 F.2d 879 (Cust. & Pat.App.1979). In *Phillips,* the computer program was designed to prepare a complete set of printed architectural specifications, eliminating the need for hand-written specifications. The PTO rejected the claims under Section 101, as nonstatutory because the program was described in mathematical form and accordingly was an algorithm. It reasoned that because the digital computer operated mathematically, employing numerical quantities according to at least one radix, "even though, to the user, the problem did not appear to be in mathematical form," the patent recited an algorithm. The CCPA reversed this finding, holding that a radix, although expressed in mathematical terms, merely defines a system and is not an algorithm as defined by *Benson* because it did not arithmetically calculate the solution to a mathematical problem. *Id.* at 881–82.

Finally, in *In re Pardo, supra,* the patent claimed a process which allegedly converted a computer from a sequential processor to a processor which was not dependent upon the order in which the computer received the input data. The inventor had applied for the patent prior to *Benson* and had used the term "algorithm" within the description of the patent's specifications. The PTO treated the use of the word "algorithm" as an admission that the claims were drawn to nonstatutory subject matter. The CCPA disagreed with the PTO's conclusion that the use of the word "algorithm was not an admission and noted that the inventors had filed their patent application more than two years before the decision in Benson." The CCPA, thereby, evaluated the substantive claims of the patent and found that the claims did not describe an algorithm in the mathematical sense of the word, but rather an algorithm in the computer sense:

There is no indication that "algorithm," as used by appellants, means "mathematical algorithm" as that has been used by the Supreme Court.

\* \* \* \* \* \*

Appellants method claims are directed to executing programs in a computer. The method operates on *any* program and *any* formula which may be input, regardless of mathematical content. That a computer controlled according to the invention is capable of handling mathematics is irrelevant to the question of whether a mathematical algorithm is recited by the claims.

*Id.* at 915–16. Accordingly, the CCPA held that the patent claims were not unpatentable under *Benson* but constituted proper statutory subject matter, stressing that "[a] claim drawn to subject matter otherwise statutory does not become nonstatutory simply because it uses a mathematical formula, computer or digital computer. *Id.* at 916 (quoting *Diamond v. Diehr,* 450 U.S. 175, 187, 101 S.Ct. 1048, 1057, 67 L.Ed.2d 155 (1981)).

Accordingly, under *Toma, Phillips,* and *Pardo,* the CCPA has held that the Supreme Court in *Benson* used the term "algorithm" in a specific sense, "a procedure for solving a given type of mathematical problem." 409 U.S. at 65, 93 S.Ct. at 254. Using this definition, this Court has carefully examined the claims in this case and is unable to find any direct or indirect recitation of a procedure for solving a mathematical problem. Rather, the patent allegedly claims a methodology to effectuate a highly efficient business system and does not restate a mathematical formula as defined by *Benson.* Nor are any of the recited steps in the claims mere procedure for solving mathematical problems. Accordingly, the claims do not recite or preempt an algorithm.

### B. *Method of Doing Business*

Paine Webber contends that the '442 patent is unpatentable for another reason. It

**7.** The Court also held that a computer program designed to translate natural language was within the technological arts because it is a method of operating a machine.

claims that the patent defines "nothing more than familiar business systems, that is, the financial management of individual brokerage accounts." It urges the Court to focus on the product of the '442 patent claims, that is, the services the CMA provides to the customers of Merrill Lynch rather than to focus on the method by which the CMA operates. This argument is similar to the one that was advanced in *Toma,* but rejected by the CCPA. In *Toma,* the Examiner first noted that all statutory subject matter "must be in the 'technological' or 'useful' arts, and that, as far as computer-related inventions are concerned, *only* those inventions which 'enhance the internal operation of the digital computer' are in the 'technological' or 'useful' arts." The Examiner thereafter found that natural language translation was merely a "liberal art" and that the translation by a computer does not "transform the activity into a 'technological art'." Thus, the Examiner held the patent was unpatentable under Section 101. 575 F.2d at 877.

The CCPA disagreed with the Examiner and looked to the method by which the computer translated the natural languages. It held that the focus of analysis should be on the operation of the computer program and not on the product of the computer program (i.e. the translation). It stressed that the operation of the computer is within the "technological arts" and a computer which effects the operation of the computer is also patentable.

> [t]he "technological" or "useful" arts inquiry *must* focus on whether the claimed subject matter (a method of operating a machine to translate) is statutory, not on whether the product of the claimed subject matter (a translated text) is statutory, not on whether the prior art which the claimed subject matter purports to replace (translation by human mind) is statutory, and *not* on whether the claimed subject matter is presently perceived to be an improvement over the prior art, e.g., whether it "enhances" the operation of a machine. This was the law prior to *Benson* and was not changed by *Benson.*

*Id.* at 877–78. *See also Application of Phillips,* 608 F.2d 879 (Cust. & Pat.App.1979) (computer program designed to prepare architectural specification eliminating handwritten specification constitute proper statutory subject matter). *In re Johnston,* 502 F.2d 765 (Cust. & Pat.App.1974), *rev'd on other grounds sub nom. Dann v. Johnston,* 425 U.S. 219, 96 S.Ct. 1393, 47 L.Ed.2d 692 (1976) (computer program for an automatic financial record-keeping system within the technological arts; the Supreme Court expressly declined to discuss the Section 101 arguments because it held that the patent was invalid and unenforceable under Section 103).

■ The subject matter of the '442 patent claims are similar to the claims of the patents in *Toma, Phillips,* and *Johnston.* The product of the claims of the '442 patent effectuates a highly useful business method and would be unpatentable if done by hand. The CCPA, however, has made clear that if no *Benson* algorithm exists, the product of a computer program is irrelevant, and the focus of analysis should be on the operation of the program on the computer. The Court finds that the '442 patent claims statutory subject matter because the claims allegedly teach a method of operation on a computer to effectuate a business activity. Accordingly, the '442 patent passes the threshold requirement of Section 101.[8]

## V. *Merrill Lynch's Third Party Complaint*

Paine Webber also moves this Court (1) to strike the Third Party Complaint against Dean Witter on the grounds that the Third Party Complaint does not comply with Rule 14(a) in that it does not allege that Dean Witter is liable to Merrill Lynch for all or part of Paine Webber's claim against Merrill Lynch, or (2) to dismiss or sever the Third Party Complaint against Dean Witter on the grounds that the attempted joinder of Dean Witter does not comply with the provisions of Rules 13(h), 19 or 20, Fed.R. Civ.P.

---

**8.** The Court, of course, is not deciding whether the patent in suit is invalid under any other provision of the patent laws of the United States.

■ Rule 14(a) provides that a defendant may become a third party plaintiff by causing a complaint to be served upon a person not a party to the original action "who is or may be liable to him for all or part of the plaintiff's claim against him." Merrill Lynch does not assert that Dean Witter is liable for any or all part of Paine Webber's claim against Merrill Lynch. Accordingly, Dean Witter may not be brought into this action as a third party defendant under Rule 14(a).

■ Merrill Lynch, nevertheless, argues that Dean Witter may be made a party in this action under Rules 13(h) and 20(a). Rule 13(h) provides that "[p]ersons other than those made parties to the original action may be made parties to a counterclaim or cross-claim in accordance with the provisions of Rules 19 and 20." Merrill Lynch contends that Rule 20(a) permits it to join Dean Witter in this action. Rule 20(a) in pertinent part provides:

> All persons ... may be joined in one action as defendants if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of, or arising out of the same transaction or occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action.

The quoted language contemplates two tests for joinder: (1) the occurrence of some question of fact or law common to all parties, and (2) the existence of a right to relief predicated upon or arising out of a single transaction or occurrence or series thereof. Both tests must be satisfied if joinder is to be permitted. *Mesa Computer Utilities, Inc. v. Western Union Computer Utilities, Inc.,* 67 F.R.D. 634, 636 (D.Del.1975).

Merrill Lynch relies on the federal policy which encourages the joinder of claims, parties and remedies. *See e.g., United Mine Workers of America v. Gibbs,* 383 U.S. 715, 724, 86 S.Ct. 1130, 1137, 16 L.Ed.2d 218 (1966); *Mesa Computer, supra; Marsland Engineering Ltd. v. Control Data Corp.,* 175

U.S.P.Q. 440, 442 (D.Del.1972). It relies upon several cases arising under Rule 42(a), Fed.R.Civ.P., which allowed consolidation when the separate patent actions involved common questions of law or fact.[9] *See e.g., In re Multidistrict Litigation Involving Frost Patent,* 398 F.Supp. 1353 (D.Del.1975), *aff'd in part and rev'd in part,* 540 F.2d 601 (3d Cir.1976); *Celanese Corp. v. E.I. duPont de Nemours & Co.,* 58 F.R.D. 606 (D.Del. 1973); *Rohm & Haas Co. v. Mobil Oil Corp.,* 525 F.Supp. 1298, 1309 (D.Del.1981).

Rule 42(a), however, is distinguishable from Rule 20(a) because cases may be consolidated under Rule 42(a) before trial, when the actions involve a common question of law or fact. No requirement exists, as in Rule 20(a), that the right to relief must be predicated upon or must have arisen out of a single transaction or occurrence or series thereof. Accordingly, although the Court recognizes that there is a strong federal policy to join claims, parties and remedies, those cases relied upon Merrill Lynch applying Rule 42(a) are not dispositive of Paine Webber's motion under Rule 20(a).

Merrill Lynch also relies upon *H. Kohnstamm & Co. v. Allied Chemical Corp.,* 182 U.S.P.Q. 360 (S.D.N.Y.1974) for the proposition that a patentee may join an infringer under Rule 20(a) and proceed against multiple infringers in a single action. In *Kohnstamm,* the plaintiff, Warner-Jenkinson, brought action against Allied Chemical Corp. ("Allied") seeking a declaratory judgment that United States Patent No. 3,519,- 617 ("the '617 patent"), owned by Allied was invalid and unenforceable. Allied counterclaimed against the plaintiffs seeking damages for the infringement of the '617 patent. Allied also joined the Seven-Up Company ("Seven-Up") charging it with patent infringement. The court permitted the joinder of Seven-Up pursuant to Rule 13(h) in accordance with the provisions of Rule 20(a) for the reason that joinder

---

**9.** No dispute exists between the parties that common questions of fact and law exist because both Paine Webber and Dean Witter allege that the '442 patent is invalid and unenforceable.

would avoid multiple lawsuits involving common questions of law ·or fact.

*Kohnstamm* did not discuss the requirement that the right to relief must be predicated upon or must have arisen out of a single transaction or occurrence or series thereof because this second test of joinder was not in dispute among the parties. (*See* D.I. 40, Ex. A, Affidavit of Carr, trial counsel for Warner-Jenkinson and Seven-Up.) Warner-Jenkinson, the plaintiff, was a wholly owned subsidary of Seven-Up, and Allied had alleged that Seven-Up had induced Warner-Jenkinson to infringe the '617 patent. The allegations against Seven-Up, therefore, were based on the same series of occurrences underlying those allegations asserted by Allied against Warner-Jenkinson. Accordingly, joinder was proper under Rule 20(a).

 While Merrill Lynch's counterclaim and Third Party Complaint alleges acts of infringement by Paine Webber and Dean Witter, there is no allegation that the acts of infringement are connected in any manner. Allegations of infringement against two unrelated parties based on different acts do not arise from the same transaction. *See Siemens Aktiengesellschaft v. Sonotone Corp.,* 370 F.Supp. 970 (N.D.Ill.1973). Accordingly, Merrill Lynch's attempt to join Dean Witter as a third party or as a counterclaim defendant is improper and Merrill Lynch's Third Party Complaint must be dismissed.

## VI. *Leighton's Third Party Complaint*

Leighton has moved this Court pursuant to Rules 19 and 21 as a *pro se* litigant to join Leighton as a third party plaintiff. Leighton contends that his action is brought to redress the unfair competition that arises out of Merrill Lynch's use of the '442 patent and the CMA trademark. Leighton asserts that jurisdiction exists by virtue of 28 U.S.C. § 1338(b). It seeks this Court to declare the '442 patent and CMA trademark invalid and unenforceable and to enjoin Merrill Lynch from further violating Section 7 of the Investment Company Act of 1940, 15 U.S.C. § 80a–7 (1976), the Glass Steagall Act, 12 U.S.C. § 378(a) (Supp. 1980), the Bank Holding Company Act of 1956, 12 U.S.C. § 1842(a) (Supp.1980), Section 19(b) of the Federal Reserve Act, 12 U.S.C. § 461(b) (Supp.1980), the Securities Act of 1933, and Section 17(b) of the Investment Company Act of 1940, 15 U.S.C. § 80a–17(b) (1976), by using the '442 patent.

 The motion to join Leighton as a third party plaintiff is not properly drafted because Leighton is not a party to the action and neither Paine Webber nor Merrill Lynch seeks leave to join Leighton as a plaintiff through any of the appropriate joinder devices. Rather, Leighton, on his own behalf, seeks to join this action as a party plaintiff and, to that end, erroneously invokes the joinder of parties' provisions of Rules 19 and 21. *See Parker-Hannifin Corp. v. Samuel Moore & Co.,* 436 F.Supp. 498, 500 (N.D.Ohio 1977). Properly pleaded, Leighton's participation in these proceedings should be pursued through the intervention procedures established in Rule 24, Fed.R.Civ.P.

 Even if the Court were to treat Leighton's motion as a motion to intervene pursuant to Rule 24, the Court must nonetheless deny the motion. Rule 24 makes a distinction between intervention as of right and discretionary intervention and provides:

(a) Intervention of Right. Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

(b) Permissive Intervention. Upon timely application anyone may be permitted to intervene in an action: (1) when a statute of the United States confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or

fact in common. When a party to an action relies for ground of claim or defense upon any statute or executive order administered by a federal or state governmental officer or agency or upon any regulation, order, requirement, or agreement issued or made pursuant to the statute or executive order, the officer or agency upon timely application may be permitted to intervene in the action. In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties. No evidence exists to indicate that Leighton is seeking to intervene by virtue of any statute, therefore, the Court will look to Rule 24(a)(2) and (b)(2)—nonstatutory intervention.

■ Under Rule 24(a)(2), an applicant for nonstatutory intervention as of right must meet the following requirements: the application must (1) be timely, (2) show an interest in the subject matter of the action, (3) show that the protection of the interest may be impaired by the disposition of the action, and (4) show that the interest is not adequately represented by an existing party. No question exists as to the timeliness of the action as Leighton moved this Court less than two months after the commencement of the suit by Paine Webber and before Merrill Lynch filed its answer and counterclaim. Leighton, however, has not demonstrated that he satisfies the second and third requirement of Rule 24(a)(2).

■ The second requirement an applicant for intervention under Rule 24(a)(2) must demonstrate is that he has an interest relating to the transaction or property that is the subject of the action. Leighton has not borne this burden. He does not claim any right, title, or interest in the '442 patent. The only interest which he is claiming is that if the '442 patent is found to be valid then he might lose customers to Merrill Lynch because Merrill Lynch is offering a better financial service. This interest, without any factual support, is too speculative and therefore not a direct interest to satisfy Rule 24(a)(2). *See* 3B Moore's Federal Practice ¶ 24.07[2].

Leighton also has not demonstrated that he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest. This is not a case where a discrete, distinguishable fund exists and where the proposed intervenor has some presently, legally enforceable interest in that fund or where his claim against that fund arises from the same factual basis as does the claim in the original action. *See Calvert Fire Insurance Co. v. Environs Development Corp.,* 601 F.2d 851 (5th Cir.1979). Nor is this a case where, without intervention, it would be impossible for the proposed intervenor to obtain in personam jurisdiction over an alien party in which it seeks relief. *See Diaz v. Southern Drilling Corp.,* 427 F.2d 1118 (5th Cir.), *cert. denied,* 400 U.S. 878, 91 S.Ct. 118, 27 L.Ed.2d 115 (1970).

Finally, this is not a case where if the action is decided in the intervenor's absence, the *stare decisis* effect of the decision would significantly impair the intervenor's ability to prosecute his allegations. *See Jet Traders Investment Corp. v. Tekair Ltd.,* 89 F.R.D. 560, 570–71 (D.Del.1981). The legal arguments asserted by Leighton are significantly different from those arguments asserted by Paine Webber. Any holding against Paine Webber would not have an effect on Leighton's ability to pursue his allegations against Merrill Lynch. Accordingly, Leighton cannot intervene in this action pursuant to Rule 24(a)(2).

■ Rule 24(b)(2) authorizes a court to grant a party leave to intervene in an action when an applicant's claim or defense and the main action have a question of law or fact in common provided that the court, in its discretion, shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties. In order to intervene pursuant to Rule 24(b)(2), an intervenor must establish the existence of a jurisdictional basis for its claims independent of the jurisdiction that the court has over the claims in the principal action. *See Jet Traders Investment Corp. v. Tekair Ltd.,* 89 F.R.D. 560, 566 (D.Del.1981).

Leighton's complaint has one count which alleges that the '442 patent is invalid and unenforceable and that the use of the patent and the CMA trademark constitutes unfair competition. Leighton asserts that jurisdiction exists by virtue of 28 U.S.C. § 1338(b) which provides that a district court has original jurisdiction of any action asserting a claim of unfair competition when joined with substantial and related claims under the patent laws. As Judge Steel stated in *American Security Co. v. Shatterproof Glass Corp.,* 166 F.Supp. 813, 824 (D.Del.1958):

> Section 1338(b) is a reflection of the doctrine enunciated in *Hurn v. Oursler* [289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148] .... There it was held in a nondiversity case that where a single cause of action is alleged based upon both a federal ground of copyright infringement and a common law ground of unfair competition, jurisdiction over the non-federal ground exists if the federal question "is not plainly wanting in substance." * * *
>
> If it appears that a plaintiff is "not really relying upon the patent law for his alleged rights" then the claim does "not really and substantially involve a controversy within the jurisdiction of the court";

Leighton, therefore, must demonstrate to the Court that he has a substantial claim which arises under the patent law before he may assert his claim for unfair competition. In order to demonstrate that he has a substantial claim which arises under the patent laws, Leighton must show that there is a genuine controversy between Merrill Lynch and Leighton by demonstrating that Merrill Lynch has threatened to assert its patent rights against Leighton. *See, e.g., Enka B.V. of Arnhem Holland v. E.I. duPont de Nemours & Co.,* 519 F.Supp. 356 (D.Del.1981). Although numerous cases recognized that a justiciable controversy exists where a threat of infringement action is indirect and unspecific, *see, e.g., Simmonds Aerocessories, Ltd. v. Elastic Stop Nut Corp. of America,* 257 F.2d 485, 490 (3d Cir.1958); *Federal Telephone & Radio Corp. v. Associated Telephone & Telegraph Co.,* 169 F.2d 1012 (3d Cir.), *cert. denied,* 335 U.S. 859, 69 S.Ct. 133, 93 L.Ed. 406 (1948); *Enka B.V. of Arnhem, Holland v. E.I. duPont de Nemours & Co.,* 519 F.Supp. 356, 365 (D.Del.1981), Leighton has neither alleged nor demonstrated that Merrill Lynch has made any threats whatsoever. Therefore, no justiciable dispute exists with respect to the patent law and the Court cannot exercise its pendant jurisdiction granted by Section 1338(b). Accordingly, the Court does not have jurisdiction and Leighton's motion under Rule 24(b)(2) must also be denied.

An order will be entered in accordance with this opinion.