**STATE STREET BANK AND TRUST COMPANY, Plaintiff,**

v.

**SIGNATURE FINANCIAL GROUP, INC., Defendant.**

**Civil Action No. 94–11344–PBS.**

United States District Court, D. Massachusetts.

March 26, 1996.

William L. Patton, James L. Sigel, Sharon Baker Morin, Ropes & Gray, Boston, MA, Maurice E. Gauthier, Samuels, Gauthier & Stevens, Boston, MA, for State Street Bank & Trust Co.

Philip G. Koenig, James J. Foster, Philip G. Koenig, Wolf, Greenfield & Sacks, Boston, MA, Steven L. Friedman, Dilworth, Paxson, Kalish & Kauffman, Philadelphia, PA, for Signature Financial Group, Inc.

## MEMORANDUM AND ORDER

SARIS, District Judge.

### I. *Introduction*

Plaintiff, State Street Bank and Trust Company ("State Street") brings this action against Defendant, Signature Financial Group, Inc. ("Signature"), seeking a declara- tory judgment that Signature's patent for a computerized accounting system for manag- ing a mutual fund investment structure is invalid and unenforceable.[1]  After hearing, the Court *ALLOWS* Plaintiff's motion for partial summary judgment and *DISMISSES* Defendant's counter-claims.

### II. *Background*

State Street and Signature are companies, which, among other things, act as administra- tors and accounting agents of mutual funds. Signature owns U.S. Patent No. 5,193,056 ("056 Patent"), entitled "Data Processing System for Hub and Spoke Financial Ser- vices Configuration," issued on March 9, 1993, by assignment of the inventor, R. Todd Boes.  As the patent summary states, the claimed invention "provides a data processing system and method for monitoring and re- cording the information flow and data, and making all calculations, necessary for main- taining a partnership portfolio and partner fund (Hub and Spoke) financial services con- figuration."  In order to assess the scope and nature of the claimed invention, it is first necessary to discuss briefly the financial con- figuration which the data processing system is designed to service.

### A. *Hub and Spoke Configuration*

The invention relates to a newly-developed financial investment vehicle, which State Street terms a "multi-tiered fund complex" and Signature calls by its own proprietary mark, a "Hub and Spoke" configuration.  In essence, a Hub and Spoke arrangement is an investment structure whereby mutual funds ("Spokes") pool their assets in an investment portfolio ("Hub") organized as a partnership. "This financial services configuration involves an entity that is treated as a partnership for federal income tax purposes and that holds the investment portfolio ... and funds that invest as partners in the partnership portfo- lio."  056 Patent, col. 1.  Enabling mutual

---

1.  The Complaint seeks the following declaratory judgments:  invalidity (Count I), noninfringement (Count II), unenforceability by reason of inequi- table conduct (Count III), and unenforceability by reason of misuse (Count IV).  Signature has filed two counter-claims:  that State Street has committed an unfair and deceptive trade practice in violation of M.G.L. c. 93A by bringing the present declaratory judgment action in an at- tempt to maintain market share and malign De- fendant (Count I), and its own declaratory judg- ment that an agent of State Street had entered into a binding oral licensing agreement with Signature regarding the data processing system allegedly protected by State Street's patent (Count II).

funds to pool their assets in this manner provides for economies of scale with regard to the costs of fund administration and has beneficial tax consequences.

This complex financial structure, however, creates its own set of administrative challenges. As a partnership, the Hub portfolio assesses all economic gains and losses with respect to the Spoke funds on a pro rata basis. Because each of the Spokes are themselves investment vehicles, which are subject to constant changes in assets as individual investors add or withdraw funds and market prices fluctuate, the partnership interest of the Spokes in the Hub constantly varies. Administering this structure requires a daily allocation of income, capital gains, and expenses or investment losses. The daily allocations are made on the basis of the Spoke funds' percentage share in the total assets of the Hub portfolio.

### B. *The Claimed Invention*

Signature's invention is directed to a data processing system for administering this Hub and Spoke configuration. The disclosure provides extensive flowcharts and a detailed description of the invention's preferred embodiment. The system is operated by means of a personal computer, software capable of performing the various functions described in the claims and detailed in the preferred embodiment and flowcharts, data storage means such as a floppy disk, and display means such as printed output and a computer screen.

Specifically, the invention calculates and stores data representing: the percentage share that each Spoke fund holds in the Hub portfolio; any daily activity affecting the portfolio's assets; allocations of gains, losses and expenses to each of the Spoke member funds; and tracking and updating data that are used to determine aggregate year-end income, gains, losses, and expenses for accounting and tax purposes.

The invention is claimed in means-plus-function language as an apparatus.[2] Of the six claims, only the first is independent:

(1) A data processing system for managing a financial services configuration of a portfolio established as a partnership, each partner being one of a plurality of funds, comprising:

(a) computer processor means for processing data;

(b) storage means for storing data on a storage medium;

(c) first means for initializing the storage medium;

(d) second means for processing data regarding assets in the portfolio and each of the funds from a previous day and data regarding increases or decreases in each of the funds, assets and for allocating the percentage share that each fund holds in the portfolio;

(e) third means for processing data regarding daily incremental income, expenses, and net realized gain or loss for the portfolio and for allocating such data among each fund;

(f) fourth means for processing data regarding daily net unrealized gain or loss for the portfolio and for allocating such data among each fund; and

(g) fifth means for processing data regarding aggregate year-end income, expenses, and capital gain or loss for the portfolio and each of the funds.

The specification discloses the specific structure, circuitry or other devices by which the invention operates as follows:

The portfolio/fund accountant makes use of a personal computer 44 programmed with software 50. One example of software 50 is the "HandS" (a service mark of Signature Financial Group, Inc.) computer program. The personal computer 44 used by portfolio/fund accountant is capable of producing printed output 46 and storing data on data disk 52, which preferably is a

---

**2.** The use of means-plus-function language results in construction of the claim as an apparatus (i.e., machine) rather than a method (i.e., process), even if no discrete devices or structures are described in the claim itself. *See* 35 U.S.C. § 112, para. 6. Structure is imparted to the apparatus claims by reference to devices or apparatus disclosed in the specification. *See In re Donaldson Co.*, 16 F.3d 1189, 1192–94 (Fed.Cir. 1994) (en banc).

floppy disk, although other types of storage media may be used.

'056 Patent, col. 6 (numbers are references to flowcharts included in specification).

By way of patent prosecution history, the patent examiner apparently pondered whether to deny patentability on statutory-subject matter grounds but after consultation with other examiners determined that the claimed invention was directed to statutory subject matter. The patent application originally included both apparatus and method claims. The six apparatus claims were determined to be patentable, while the six method claims (phrased identically to the apparatus claims except for the absence of means-plus-function language as used in claim one quoted above) were rejected. Indeed, throughout the patent specification, there are numerous references to the invention as a "data processing system and method," even though the claims themselves state only an apparatus. '056 Patent, col. 4–5. The record does not disclose why the method claims were not successfully prosecuted.

Signature admits that it informed State Street that any data processing system designed to perform book accounting for a multi-tiered fund arranged in a Hub and Spoke configuration likely would infringe the '056 Patent. Answer ¶ 12. State Street serves as the custodian and accounting agent for several multi-tiered fund complexes and had negotiated with Signature for a license for its patented data processing system. When negotiations broke down, State Street brought the present declaratory judgment action seeking to invalidate Signature's patent.

### III. *Analysis*

State Street alleges that Signature's patent is not drawn to statutory subject matter under 35 U.S.C. § 101 because the invention claims an unpatentable mathematic algorithm as defined by established Supreme Court precedent. Signature counters that its data processing system is a computer-implemented invention that is patentable both under recent Federal Circuit precedent and guidelines for patent examiners issued by the U.S. Patent and Trademark Office ("PTO").

The core issue on summary judgment is whether computer software that essentially performs mathematical accounting functions and is configured to run on a general purpose (i.e., personal) computer is patentable under 35 U.S.C § 101. "[T]he question whether computer-related inventions driven by mathematically-based software deserve the market protection afforded under federal patent law has vexed both theorists and practitioners since computers entered the marketplace some thirty years ago." John A. Burtis, *Towards a Rational Jurisprudence of Computer–Related Patentability in Light of In re Alappat,* 79 MINN.L.REV. 1129, 1129 (1995). It is into this jurisprudential quagmire that the Court must dive.

### A. *Summary Judgment*

Unlike the question presented in this case, the standards for summary judgment are familiar and well defined. "Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Barbour v. Dynamics Research Corp.,* 63 F.3d 32, 36 (1st Cir.1995) (quoting Fed.R.Civ.P. 56(c)). "To succeed [in a motion for summary judgment], the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair,* 902 F.2d 140, 143 (1st Cir.1990); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

"Once the moving party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.'" *Barbour,* 63 F.3d at 37 (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986)). "There must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be

granted.' " *Rogers,* 902 F.2d at 143 (quoting *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11) (citations and footnote in *Anderson* omitted). The Court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Barbour,* 63 F.3d at 36.

■ The standard for summary judgment here is no different from that traditionally employed by courts as "summary judgment is as appropriate in a patent case as any other." *Avia Group Int'l Inc. v. L.A. Gear Calif., Inc.,* 853 F.2d 1557, 1561 (Fed. Cir.1988). Moreover, "whether a claim is directed to statutory subject matter is a question of law," *Arrhythmia Research Technology, Inc. v. Corazonix Corp.,* 958 F.2d 1053, 1055 (Fed.Cir.1992), that is particularly amenable to decision on summary judgment.

■ To prevail on its motion for summary judgment, State Street must overcome a statutory presumption favoring the validity of Signature's '056 Patent. *See* 35 U.S.C. § 282; *Checkpoint Systems, Inc. v. United States Int'l Trade Comm'n,* 54 F.3d 756, 761 (Fed.Cir.1995) ("A patent is presumed valid[, and] the presumption of validity ... places the burden of going forward and of persuasion on the party asserting invalidity.").

B. *General Principles of Subject–Matter Patentability*

Section 101 of Title 35 of the U.S. Code provides:

> Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

Thus, the statute sets out four categories of subject matter—process, machine, manufacture, and composition of matter—that are entitled to patent protection provided that the other requirements of patentability (i.e., novelty and non-obviousness under 35 U.S.C. §§ 102–103) are satisfied. Although § 101 has been broadly construed to "include anything under the sun that is made by man," *Diamond v. Chakrabarty,* 447 U.S. 303, 309–10, 100 S.Ct. 2204, 2207–08, 65 L.Ed.2d 144 (1980) (quoting legislative history of 1952 recodification), "[t]his is not to suggest that § 101 has no limits or that it embraces every discovery." *Id.* "To include some things [in § 101] is to exclude others." *In re Warmerdam,* 33 F.3d 1354, 1358 (Fed.Cir.1994).

■ "An idea is itself not patentable, but a new device by which it may be made practically useful is." *Rubber–Tip Pencil Co. v. Howard,* 87 U.S. (20 Wall.) 498, 507, 22 L.Ed. 410 (1874). Over time, the Supreme Court further explained this limit to subject matter patentability:

> The laws of nature, physical phenomena, and abstract ideas have been held not patentable. Thus, a new mineral discovered in the earth or a new plant found in the wild is not patentable subject matter. Likewise, Einstein could not patent his celebrated law that $E = mc^2$; nor could Newton have patented the law of gravity. Such discoveries are "manifestations of ... nature, free to all men and reserved exclusively to none."

*Chakrabarty,* 447 U.S. at 309, 100 S.Ct. at 2207 (quoting *Funk Bros. Seed Co. v. Kalo Inoculant Co.,* 333 U.S. 127, 130, 68 S.Ct. 440, 441, 92 L.Ed. 588 (1948)) (citations omitted). Therefore, "[w]hile a scientific truth, or the mathematical expression of it, is not patentable invention, a novel and useful structure created with the aid of scientific truth may be." *Mackay Radio & Telegraph Co., Inc. v. Radio Corp. of America,* 306 U.S. 86, 92–94, 59 S.Ct. 427, 430–31, 83 L.Ed. 506 (1939).

The reason for this rule is simple, "[p]henomena of nature, though just discovered, mental processes, and abstract intellectual concepts are not patentable, as they are the basic tools of scientific and technological work." *Gottschalk v. Benson,* 409 U.S. 63, 67, 93 S.Ct. 253, 255, 34 L.Ed.2d 273 (1972). Granting a patent monopoly on the use of a scientific principle, rather than on its particular practical application, would impede rather than "promote the Progress of Science and useful Arts." U.S. Const. Art. I, cl. 8 (patent and copyright clause).

This distinction between abstract idea and patentable subject matter, however, is more

easily stated than applied. For example, while the capacity of electricity to be used as a mode of communication is not itself patentable, the specific manifestation of that idea in Morse's electric telegraph was held patentable. *See O'Reilly v. Morse*, 56 U.S. (15 How.) 62, 117, 14 L.Ed. 601 (1853). Similarly, a mathematical equation is not itself patentable, but its use in a computer-automated synthetic rubber curing process was held statutory subject matter. *See Diamond v. Diehr*, 450 U.S. 175, 185–88, 101 S.Ct. 1048, 1056–57, 67 L.Ed.2d 155 (1981) (holding patentable computer-implemented rubber curing process because inventors' "process admittedly employs a well-known mathematical equation, but [the inventors] do not seek to pre-empt use of that equation. Rather, they seek only to foreclose from others the use of that equation in conjunction with all the other steps in their claimed process.").

The determination of patentability of computer software is particularly difficult because a computer program directs the computer to perform mathematical functions (i.e., process data) to achieve a desired result. *See* Jur Strobos, *Stalking the Elusive Patentable Software*, 6 HARV.J.L. & TECH. 363, 377 (1993) ("A computer program is nothing more than a series of mathematical steps conducted by a machine composed of electronic switches and storage sites."); *cf.* David L. Stewart, *Patenting of Software— Proposed Guidelines and the Magic Dividing Line that Disappeared*, 77 J.PAT. & TRADEMARK OFF.SOC'Y 681, 684–88 (1995) (mathematics are nothing more than a symbolic language for expressing abstract relationships); *Random House Unabridged Dictionary* 1186 (2d ed. 1993) (defining mathematics as "the synthetic treatment of magnitude, relationships between figures and forms, and relations between quantities expressed symbolically.").

## C. *The Supreme Court Trilogy*

A trilogy of Supreme Court opinions grapples with the scope of patent protection to afford computer software. The first, *Gottschalk v. Benson*, 409 U.S. 63, 65, 93 S.Ct. 253, 254, 34 L.Ed.2d 273 (1972), involved an attempt to patent "a method of programming a general-purpose digital computer to convert signals from binary-coded decimal form into pure binary form." The mathematical procedures in *Benson* could be carried out "in existing computers long in use, no new machinery being necessary." *Id.* at 67, 93 S.Ct. at 255. Such conversion was achieved through what the Court termed an algorithm, defined as "[a] procedure for solving a given type of mathematical problem." *Id.* The Court held that the claimed process was not statutory:

It is conceded that one may not patent an idea. But in practical effect that would be the result if the formula . . . were patented in this case. The mathematical formula involved here has no substantial practical application except in connection with a digital computer, which means that . . . the patent would wholly pre-empt the mathematical formula and in practical effect would be a patent on the algorithm itself.

*Id.* at 71–72, 93 S.Ct. at 257. Allowing a patent on a computer program that simply converts one set of numbers into another would preempt the mathematical formula on which the software was based. Thus, the Court held the patent invalid.

Although the Court stopped short of holding that a computer software program was never patentable, it held the "transformation and reduction of an article 'to a different state or thing' is the clue to the patentability of a process claim, that does not include particular machines." *Id.* at 70, 93 S.Ct. at 256. The processing of numbers by means of a mathematical equation via a general purpose computer was not sufficient to satisfy this requirement.

In the second case, *Parker v. Flook*, 437 U.S. 584, 98 S.Ct. 2522, 57 L.Ed.2d 451 (1978), the Court similarly held unpatentable a process for updating "alarm limits" for the catalytic conversion of hydrocarbons. Unlike *Benson*, here the patent was directed to a mathematical formula or algorithm tied to a specific post-solution activity (i.e., adjusting alarm limits at which chemical reactions become unstable). *Flook*, 437 U.S. at 586–87, 98 S.Ct. at 2523–24. The Court held:

The notion that post-solution activity, no matter how conventional or obvious in it-

self, can transform an unpatentable principle into a patentable process exalts form over substance. A competent draftsman could attach some form of post-solution activity to almost any mathematical formula; the Pythagorean theorem would not have been patentable, or partially patentable, because a patent application contained a final step indicating that the formula, when solved, could be usefully applied to existing surveying techniques.

*Id.* at 590, 98 S.Ct. at 2525. Notwithstanding any field-of-use limitation, the claimed invention merely calculated numerical values. Adopting the reasoning of the Court of Customs and Patent Appeals ("C.C.P.A.") (the Federal Circuit's predecessor), the Court held " 'if a claim is directed essentially to a method of calculating, using a mathematical formula, even if the solution is for a specific purpose, the claimed method is nonstatutory.' " *Id.* at 595, 98 S.Ct. at 2528 (quoting *In re Richman*, 563 F.2d 1026, 1030 (C.C.P.A. 1977)). "Very simply", the Court noted, "[O]ur holding today is that a claim for an improved method of calculation, even when tied to a specific end use, is unpatentable subject matter under § 101." *Id.* at 594 n. 18, 98 S.Ct. at 2527 n. 18.

The final installment in the trilogy is *Diamond v. Diehr*, 450 U.S. 175, 101 S.Ct. 1048, 67 L.Ed.2d 155 (1981), where the Court held that a process for curing synthetic rubber that employed a computer was patentable. The process involved a well-known mathematical formula coupled with constant measurement of temperature inside a mold; a computer calculated ongoing changes in temperature and automatically terminated the curing process at the proper point with a degree of precision theretofore unknown in the art.

The Court distinguished *Benson* and *Flook* by demonstrating that the claimed process in *Diehr* involved more than calculating abstract numerical values. 450 U.S. at 188, 101 S.Ct. at 1057 (formula for computing an alarm limit was nonpatentable because it was "simply a number."). Rather, the claimed process "involve[d] the transformation of an article, in this case raw, uncured synthetic rubber, into a different state or thing." *Id.*

at 184, 101 S.Ct. at 1055. This element of physical transformation, hinted at in *Benson* and *Flook*, was made explicit in *Diehr*:

> We recognize, of course, that when a claim recites a mathematical formula (or scientific principle or phenomenon of nature), an inquiry must be made into whether the claim is seeking patent protection for that formula in the abstract. A mathematical formula as such is not accorded the protection of our patent laws, and this principle cannot be circumvented by attempting to limit the use of the formula to a particular technological environment.... On the other hand, when a claim containing a mathematical formula implements or applies that formula in a structure or process which, when considered as a whole, is performing a function which the patent laws were designed to protect (e.g., *transforming or reducing an article to a different state or thing*), then the claim satisfied the requirements of § 101.

450 U.S. at 191–92, 101 S.Ct. at 1059 (citations to *Benson* and *Flook* omitted and emphasis added). The Court clarified that a claim does not become eligible for patent protection simply because all possible uses of the mathematical formula are not preempted. *Id.* at 192, n. 14, 101 S.Ct. at 1059 n. 14.

In dissent, Justice Stevens took the position that the "broad question whether computer programs should be given patent protection involves policy considerations that this Court is not authorized to address." *Id.* at 216–17, 101 S.Ct. at 1071–72. In this confusing area, he urged that his concerns would better be addressed by:

> (1) an unequivocal holding that no program-related invention is a patentable process under § 101 unless it makes a contribution to the art that is not dependent entirely on the utilization of a computer, and (2) an unequivocal explanation that the term "algorithm" as used in this case, as in *Benson* and *Flook*, is synonymous with the term "computer program."

450 U.S. at 219, 101 S.Ct. at 1073. This suggestion was consistent with Justice Douglas' earlier statement in *Benson*, where, writing for the majority, he urged Congress to clarify this murky issue through legislation.

409 U.S. at 72–73, 93 S.Ct. at 257–58 (quoting President's Commission on the Patent System (1966)). Unfortunately, however, the Supreme Court has not re-visited this question since *Diehr* and Congress has yet to legislate in this area.

Critical commentators have interpreted the Supreme Court's trilogy as establishing preemption and physical transformation as the twin touchstones of patent protection for computer software. *See* Lawrence Kass, *Computer Software Patentability and the Role of Means–Plus–Function Format in Computer Software Claims,* 15 PACE L.REV. 787 (1995) ("The Supreme Court elaborated on the *Benson* proscription against patenting pure mathematical algorithms in *Parker v. Flook* and *Diamond v. Diehr,* which collectively circumscribed what may be termed a 'physicality requirement' for processes that contain mathematical algorithms."); Strobos, *supra,* at 387 ("These two ... requirements for software patentability, are hereinafter referred to as the 'preemption' and 'transformation' inquiries, respectively.... The first addresses preemption of human use of this equation by 'head and hand.' The second addresses whether the particular claimed use is a process with a product, or a transformation and reduction of a particular entity, such as input data, to a different state, rather than an idea or 'patent protection for that formula in the abstract.' ") (quoting *Diehr,* 450 U.S. at 184, 187, 190, 101 S.Ct. at 1055, 1056, 1058).

### D. *The Freeman–Walter–Abele Test and Subsequent Federal Circuit Precedent*

■ The C.C.P.A. devised a two-part test, also followed by its successor, the Federal Circuit, to implement the principles elucidated above. *See In re Alappat,* 33 F.3d 1526, 1545 (Fed.Cir.1994) (noting this two-part analysis is not sole means of determining whether a computer-implemented invention is patentable but that it remains a useful analytic tool). Gleaned from three cases,[3] the analysis is known as the Freeman–Wal-

ter–Abele test, which the Federal Circuit has recently described as follows:

It is first determined whether a mathematical algorithm is recited directly or indirectly in the claim. If so, it is next determined whether the claimed invention as a whole is no more than the algorithm itself; that is, whether the claim is directed to a mathematical algorithm that is not applied to or limited by physical elements or process steps. Such claims are nonstatutory. However, when the mathematical algorithm is applied to one or more elements of an otherwise statutory process claim, ... the requirements of section 101 are met.

*In re Schrader,* 22 F.3d 290, 292 (Fed.Cir. 1994) (quoting *Arrhythmia,* 958 F.2d at 1058). To be patentable under this test, an invention must "comprise an otherwise statutory process whose mathematical procedures are applied to physical process steps." *Arrhythmia,* 958 F.2d at 1059.

■ Signature seeks to avoid application of this test, however, by arguing that its patent claims a machine rather than a process, and a machine is explicitly statutory under § 101. Consistent with this position, the Federal Circuit recently held that computer software becomes physical apparatus when run on a general purpose computer. *See Alappat,* 33 F.3d at 1545 ("We have held that [ ] programming creates a new machine, because a general purpose computer in effect becomes a special purpose computer once it is programmed to perform particular functions pursuant to instructions from program software."); *In re Lowry,* 32 F.3d 1579, 1583 (Fed.Cir.1994) (data structures designed to permit computer to run more efficiently "impart a physical organization on the information stored in memory"). Therefore, computer software configured to run on a general purpose computer, if claimed in means-plus-function patent language, is considered a new machine or apparatus as a matter of patent interpretation.

As the Federal Circuit also recognized, however, this issue is not determinative. Regardless of whether the claim is drafted as

---

**3.** *See In re Abele,* 684 F.2d 902 (C.C.P.A.1982); *In re Walter,* 618 F.2d 758 (C.C.P.A.1980); *In re* *Freeman,* 573 F.2d 1237 (C.C.P.A.1978).

process or apparatus, the Federal Circuit held that the mathematical algorithm/physical transformation test for statutory subject matter under § 101 applies even to "true apparatus" claims. *Alappat,* 33 F.3d at 1542. The C.C.P.A. also adopted this view:

> Labels are not determinative in § 101 inquiries. *"Benson* applies equally whether an invention is claimed as an apparatus or process, because the form of the claim is often an exercise in drafting." *In re Johnson,* 589 F.2d 1070, 1077 (C.C.P.A. 1978).... Moreover, that the claimed computing system may be a 'machine' within 'the ordinary sense of the word,' ... is irrelevant.

*In re Maucorps,* 609 F.2d 481, 485 (C.C.P.A. 1979). The analysis of the patentability of claimed subject matter therefore does not hinge on whether the claim is drafted in means-plus-function language.[4]

As repeated thrice by the Supreme Court and echoed by the Federal Circuit and the C.C.P.A., the best clue to patentability remains the mathematical algorithm/physical transformation test. *See, e.g., Alappat,* 33 F.3d at 1540–45 (holding that claimed apparatus—a "rasterizer"—that employs mathematical algorithm to enable oscillator to convert discrete waveform data samples into output illumination data for display on screen is statutory); *Arrhythmia,* 958 F.2d at 1058–61 (claimed process and apparatus that relate to improved means of electronically measuring heart activity are statutory; "resulting output is not an abstract number, but is a signal related to the patient's heart activity."); *In re Iwahashi,* 888 F.2d 1370 (Fed. Cir.1989) (holding statutory device that transforms human voice data). Although the Federal Circuit's developing precedent is not crystal clear on this point,[5] this test remains the best guidepost for determining the patentability of computer software.

Accordingly, in *Schrader,* the Federal Circuit declined to afford patent protection for a linear computer program applied to solving business problems. 22 F.3d at 292. There, the claimed invention involved a novel way of conducting auctions by specifying a method of competitive bidding on a plurality of related items, such as contiguous tracts of land or the like, so as to maximize sales revenue or profit to the seller. The court upheld the rejection of the claimed process on the ground it was a non-statutory mathematical algorithm. Contrasting claims that "involved the transformation or conversion of subject matter representative of or constituting physical activity or objects," as in *Arrhythmia,* the court held that the entering of bids in a record was non-patentable "data gathering" and calculating bids to maximize sales revenue simply involved processing one set of numbers into another. *Schrader,* 22 F.3d at 293; *accord Alappat,* 33 F.3d at 1526 (suggesting that a "business methodology for deciding how salesmen should best handle respective customers ... [does not] fall[ ] within any § 101 category.") (citing *Maucorps* ); *In re Grams,* 888 F.2d 835, 840 (Fed.Cir.1989) (pre-solution data gathering steps do not impart patentability to invention

---

4. A short illustration will suffice to bring this point home. A portion of the process claim in *Benson* read, "[t]he method of converting signals from binary coded decimal form into binary which comprises the steps of ... (1) storing the binary coded decimal signals in a reentrant shift register...." 409 U.S. at 73, 93 S.Ct. at 258. Recast in means-plus-function language, this identical claim would read, "[an apparatus for] converting signals from binary coded decimal form into binary[, comprising:] (1) [means for] storing the binary coded decimal signals." The specification would disclose a reentrant shift register as the necessary data storage means. By Signature's reasoning, this purely semantic change would permit a patent on the *Benson* algorithm. The Supreme Court's holding there did not turn on such semantic differences, and neither will the holding of this Court.

5. Several commentators have lamented that the Federal Circuit has not clearly defined the scope of subject matter patentability in this complex area. *See* Burtis, *supra,* at 1152 (noting that post-*Alappat* "[t]his area of law cries out for a new approach, faithful to Supreme Court precedent yet not unnecessarily constrained by a wealth of inconsistent lower court doctrines."); Ronald S. Laurie & Joseph K. Siino, *A Bridge Over Troubled Waters? The PTO's Proposed Examination Guidelines for Computer–Implemented Inventions and the Federal Circuit's View(s) on Software Patentability,* 415 PLI/Pat. 103, 103 (1995) ("[T]he [Federal Circuit cases dealing with software patentability] collectively represent a range of legal perspectives, and defy attempts at full reconciliation, although individual facts affecting patentability can be identified.").

claiming mathematical algorithm); *cf. In re Trovato,* 42 F.3d 1376, 1380–83 (Fed.Cir. 1994) (holding non-statutory apparatus that calculates numerical values representing shortest distance between two points in "physical task space"), *vacated,* 60 F.3d 807 (Fed.Cir.1995) (en banc) (for reconsideration in light of new patent guidelines).

### E.  *The PTO Examination Guidelines*

Recently issued PTO guidelines support this computer software patentability paradigm.  On February 28, 1996, Examination Guidelines for Computer–Related Inventions ("Guidelines") were published in the *Federal Register* and formally will become effective on March 29, 1996.  61 Fed.Reg. 7478 (1996). The Guidelines are designed to assist patent examiners in reviewing applications during patent prosecution and are intended to be consistent with Supreme Court and Federal Circuit precedent.  *Id.* at 7479.

Although published in the *Federal Register,* the "Guidelines do not constitute substantive rulemaking and hence do not have the force and effect of law." *Id.*  In its order vacating the initial panel decision in *Trovato,* however, the Federal Circuit sitting en banc recently suggested that the Guidelines may be persuasive authority.  60 F.3d at 807.[6] Given that the expertise of patent examiners is statutorily recognized, *see Interconnect Planning Corp. v. Feil,* 774 F.2d 1132, 1139 (Fed.Cir.1985), the Court finds that a brief discussion of the Guidelines is helpful here.

■ As a threshold matter, the PTO provided a framework for analyzing claims that encompass "any machine or manufacture embodiment of a process" as follows:

> If a product claim encompasses any and every computer implementation of a process, when read in light of the specification, it should be examined on the basis of the underlying process.

Guidelines, 61 Fed.Reg. at 7482.  In other words, when determining whether computer software is patentable, the manner in which it is claimed is not itself determinative, particularly when the claim language is so broad that any and all means of implementing the claimed functions on a computer would be covered by the patent.  The PTO, and this Court, must look beyond the claim drafting to determine what functions the invention performs.  If the underlying process performed by the software is non-statutory, a machine claim for the same invention is non-statutory.  *Id.* at 7482–83.

The Guidelines state that "a process that merely manipulates an abstract idea or performs a purely mathematical algorithm is non-statutory despite the fact that it might inherently have some usefulness."  *Id.* at 7484.  Incorporating the physical transformation test heretofore described in detail, the Guidelines also provide:

> If the 'acts' of a claimed process manipulate only numbers, abstract concepts or ideas, or signals representing any of the foregoing, the acts are not being applied to appropriate subject matter.  Thus, *a process consisting solely of mathematical operations, i.e., converting one set of numbers into another set of numbers, does not manipulate appropriate subject matter and thus cannot constitute a statutory process.*

*Id.* (emphasis added).  The Guidelines point out that a claimed process "that consists solely of mathematical operations is non-statutory whether or not it is performed on a computer."  *Id.*  However, a process will receive statutory protection if it is limited to a practical application of the abstract idea or mathematical algorithm in the technological arts (i.e., involve some species of physical transformation of input data).  *Id.*[7]

### F.  *The '056 Patent Analyzed*

With the foregoing in mind, the Court will analyze the '056 Patent to determine whether Signature's claimed invention, a data processing system, is drawn to statutory subject matter.

---

6. Dissenting from the en banc opinion, Judges Nies and Michel argued that *Trovato* should not be read as "an advisory opinion endorsing the proposed guidelines."  60 F.3d at 808.

7. The examples given in the Guidelines demonstrate the difficulty in applying these general principles and were helpful to this Court only when referring to particular cases.

### 1. Step One: Mathematical Algorithm Test

■ The first step in determining whether the '056 Patent is drawn to statutory subject matter is deciding whether it recites, directly or indirectly, a mathematical algorithm, which the Supreme Court in *Benson* described as "a procedure for solving a given type of mathematical problem." 409 U.S. at 65, 93 S.Ct. at 254; *see also Schrader,* 22 F.3d at 293; *Arrhythmia,* 958 F.2d at 1056 n. 3. Under this broad definition, any series of mathematical operations or calculations recite a mathematical algorithm. *Cf. Alappat,* 33 F.3d at 1542–43 & nn. 18–20 (analyzing Supreme Court trilogy and noting that opinions use terms interchangeably).[8]

Although the '056 Patent claims do not directly recite a mathematical formula, the data processing system is an apparatus specifically designed to solve a mathematical problem. Indeed, the specification is quite clear in this regard: "The present invention provides a data processing system and method for monitoring and recording the information flow and data, and *making all calculations,* necessary for maintaining a partnership portfolio and partner fund (Hub and Spoke) financial services configuration." '056 Patent col. 4 (emphasis added). The specification also is replete with flow charts that describe the numerous data processing steps. Most importantly, the claims themselves recite calculating data as a function of the machine. *Id.* at col. 13–15 (claims 3–6).

These calculations, among others, include: (1) daily allocating the assets of two or more funds that are invested in the partnership portfolio; (2) determining each fund's percentage share in the partnership entity, taking into consideration incremental changes in the portfolio's investment securities and the amount of each fund's assets; (3) allocating to each fund the portfolio's daily income, expenses, and net unrealized gain or loss; and (4) tracking and storing this information for calculating annual tax information. Interpreted in light of the specification, the '056 Patent claims recite means for solving a series of mathematical problems.

This conclusion gains support from the Federal Circuit's decision in *Schrader.* There, the patent claimed a method for grouping bids at a competitive auction in order to maximize revenue for the seller. 22 F.3d at 291–92. The Court held that "[t]he claim language ... describes the solving of a mathematical problem: determining the optimal combination of bids." *Id.* at 293. The C.C.P.A. reached the same conclusion in earlier cases. *See Maucorps,* 609 F.2d at 486 ("[A]ppellants' claimed invention as a whole comprises each and every means for carrying out a solution technique for a set of equations wherein one number is computed from a set of numbers."); *In re Gelnovatch,* 595 F.2d 32, 41 n. 7 (C.C.P.A.1979) ("Appellants' process as a whole comprises a solution technique for a set of equations wherein sets of numbers .are computed from other sets of numbers."). An invention that inputs, processes, and outputs numbers must by definition perform mathematical operations.

### 2. Step Two: Physical Transformation Test

■ The second step under the Freeman–Walter–Abele test is determining whether the claimed invention is applied to or limited by physical elements or process steps. Regardless of whether the invention performs mathematical operations, if it transforms or reduces subject matter to a different state or thing, it is statutory under § 101. While not conclusive, the clue is physical transformation. The Court holds that Signature's data processing system fails this physicality test.

---

8. This Court recognizes that the Federal Circuit in *Alappat* cautioned against relying exclusively on the mathematical algorithm test. 33 F.3d at 1542–43 (mathematical algorithm exception simply short-hand expression of principle "that certain types of mathematical subject matter, standing alone, represent nothing more than abstract ideas...."). Therefore, the Court parses the '056 Patent not only to determine whether it states a mathematical algorithm but also to judge "whether the claim ... goes beyond simply manipulating 'abstract ideas' or 'natural phenomena.'" *Warmerdam,* 33 F.3d at 1360. The mathematical algorithm test is only the first step in this inquiry.

■ The invention claimed by the '056 Patent is unlike the computer-implemented inventions that the Federal Circuit has deemed statutory in the past. *Alappat* held patentable a device for transforming numerical values to display smooth waveform data on an oscilloscope. Through mathematical operations that could be performed on a computer, the "rasterizer" permitted an oscilloscope to operate in a manner theretofore not possible and thus was "a specific machine to produce a useful, concrete, and tangible result." 33 F.3d at 1544. At least as described in the majority opinion, the physical transformation (i.e., discrete waveform data samples into anti-aliased pixel illumination data to be displayed on a display means) went beyond manipulation of mathematical constructs. *But see id.* at 1564 (Archer, C.J., dissenting) (arguing that "rasterizer *is* simply the mathematical conversion of data" which should not be patentable) (emphasis in original).

Similarly, *Arrhythmia* involved an invention that enabled a certain type of human heart activity to be measured, processed, and displayed electronically. Although mathematical calculations were part of the process, the invention "was properly viewed as a method of analyzing electrocardiograph signals in order to determine a specified heart activity." 958 F.2d at 1059. "[T]he number obtained is not a mathematical abstraction; it is a measure in microvolts of a specified heart activity, an indicator of the risk of ventricular tachycardia." *Id.* at 1060. This transformation also was sufficiently physical to warrant patent protection. *See also Abele,* 684 F.2d at 908–909 (holding patentable invention involving physical transformation of x-ray data for display on CAT scan); *In re Taner,* 681 F.2d 787, 790 (C.C.P.A.1982) (holding statutory computer-implemented method of seismic exploration).[9]

Signature's invention does not involve this type of transformation. Rather, like other accounting methods, it is designed to manip-

ulate and record numbers. Unlike the electrocardiograph in *Arrhythmia* and the CAT scan in *Abele,* Signature's data processing system does not "involve[ ] the transformation or conversion of subject matter representative of or constituting physical activity or objects." *Schrader,* 22 F.3d at 294. And, unlike the rasterizer in *Alappat,* the invention does not physically convert the data upon which it operates into a new and totally different form. A change of one set of numbers into another, without more, is insufficient to confer patent protection. The invention does nothing other than present and solve a mathematical algorithm and, therefore, is not patentable. *Cf. Abele,* 684 F.2d at 904 (requiring invention to do more than "present and solve a mathematical algorithm" to be statutory).

Consistent with this Court's conclusion, the Federal Circuit recently held non-statutory a computer-implemented invention that compiled, processed and stored business data. As previously noted, in *Schrader,* the patent application claimed a method for grouping bids at auction to maximize sales revenue for the auctioneer. The court held that "there is nothing physical about bids *per se.* Thus, the grouping or regrouping of bids cannot constitute a physical change, effect, or result." 22 F.3d at 293–94. An additional step of recording the compiled bid data was insufficient to confer patentability because "the step of entering data into a 'record' is implicit in any application of a mathematical algorithm." *Id.* at 294. Citing the Supreme Court in *Flook* and the Federal Circuit in *In re Grams,* the court noted that both presolution data gathering activity and insignificant post-solution activity (i.e., recording data) "in a claim involving the solving of a mathematical algorithm could not impart patentability to the claim." *Schrader,* 22 F.3d at 294 (citing *Flook,* 437 U.S. at 590, 98 S.Ct. at 2525; *In re Grams,* 888 F.2d 835, 840 (Fed.Cir.1989)).

---

9. Even in *Lowry,* which involved the patentability of "data structures" under §§ 102–103, the court based its decision in part on the fact that these mathematical constructs worked a "physical" change upon the computer itself that increased its operational efficiency. 32 F.3d at 1583. Here the invention does not claim data struc-

tures. Moreover, because *Lowry* does not include a discussion of subject matter patentability under § 101, it is of little assistance in the present matter. In addition, a different panel of the Federal Circuit held data structures to be unpatentable under § 101. *See Warmerdam,* 33 F.3d at 1360.

The C.C.P.A. reached the same conclusion on similar facts. In *Maucorps*, the claims were drawn to an apparatus for determining the optimum number of times a salesman should visit a client over a given length of time. 609 F.2d at 484–85. The sales model was held unpatentable because the "claimed invention as a whole comprises each and every means for carrying out a solution technique for a set of equations wherein one number is computed from a set of numbers." *Id.* at 486. As noted by the *Alappat* Court, the business methodology in *Maucorps* clearly did not fall within any § 101 category. *Alappat*, 33 F.3d at 1541.

Signature's data processing system similarly does not fall within § 101's enumeration of patentable subject matter. Like the business-related systems in *Schrader* and *Maucorps*, the '056 Patent claims an invention that essentially performs mathematical calculations on data gleaned from pre-solution activity and stores and displays the results. As with *Schrader*'s bids, the fact that those numbers represent financial constructs, such as the Hub and Spoke configuration, does not save Signature's patent. The claims do not recite any significant pre- or post-solution activity. Neither does the invention measure physical objects or phenomena as in *Arrhythmia* or *Abele* nor does it physically convert data into a different form as in *Alappat*.

"In all instances, this critical question must be answered: 'What did applicants invent?'" *Grams*, 888 F.2d at 839 (quoting *Abele*, 684 F.2d at 907). At bottom, the invention is an accounting system for a certain type of financial investment vehicle claimed as means for performing a series of mathematical functions. Quite simply, it involves no further physical transformation or reduction than inputting numbers, calculating numbers, outputting numbers, and storing numbers. The same functions could be performed, albeit less efficiently, by an accountant armed with pencil, paper, calculator, and a filing system. "The dispositive issue is whether the claim[s] as a whole recite[ ] sufficient physical activity to constitute patentable subject matter." *Schrader*, 22 F.3d at 294 n. 9. The Court holds that Signature's data processing system does not.

### G. *The Business Methods Exception*

The Court's decision comports with another doctrinal exclusion from subject matter patentability known as the "business methods exception." Numerous patent treatises recite the long-established principle that "business 'plans' and 'systems' are not patentable, even though they may not be dependent upon the aesthetic, emotional, or judgmental reactions of a human." 1 Donald S. Chisum, *Patents: A Treatise on the Law of Patentability, Validity and Infringement* § 1.03[5] at 1–75 (1990); *see also* 1 Ernest Bainbridge Lipscomb III, *Walker on Patents* § 2:17 at 171 (3d ed. 1984) ("[A] 'system' or method of transacting business in not an 'art,' [i.e., process] nor does it come within any other designation of patentable subject matter ... apart from the physical means of conducting the system."); 1 Peter D. Rosenberg, *Patent Law Fundamentals* § 6.02[3] at 6–82 (2d ed. 1995) ("Whereas an apparatus or system capable of performing a business function may comprise patentable subject matter, the law remains that a method of doing business whether or not generated by an apparatus or system does not constitute patentable subject matter.").

As established by a series of older cases, business methods are unpatentable abstract ideas. *See Loew's Drive–In Theatres, Inc. v. Park–In Theatres, Inc.*, 174 F.2d 547, 552 (1st Cir.) (equating methods of doing business with abstract idea doctrine), *cert. denied*, 338 U.S. 822, 70 S.Ct. 68, 94 L.Ed. 499 (1949); *Hotel Security Checking Co. v. Lorraine Co.*, 160 F. 467, 469 (2d Cir.1908) (same). Recent decisions, while not holding explicitly on these grounds, recognize the continued validity of that rule. *See Alappat*, 33 F.3d at 1541 (suggesting that "business methodology" is not § 101 subject matter); *Grams*, 888 F.2d at 837 (listing "methods of doing business" as among categories of nonpatentable subject matter); *Ex parte Murray*, 9 U.S.P.Q.2d 1819, 1820 (PTO Bd. of Patent App. & Int.1988) (declaring non-statutory bank accounting system). *But see Paine, Webber, Jackson & Curtis, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 564 F.Supp. 1358, 1369 (D.Del.1983) (holding

patentable computerized system of combining package of popular financial services because invention did not recite *Benson* algorithm); *Schrader,* 22 F.3d at 297 (Newman, J. dissenting) (urging that the method of doing business exception be "described as error-prone, redundant and obsolete.")

■ If Signature's invention were patentable, any financial institution desirous of implementing a multi-tiered funding complex modelled on a Hub and Spoke configuration would be required to seek Signature's permission before embarking on such a project. This is so because the '056 Patent is claimed sufficiently broadly to foreclose virtually any computer-implemented accounting method necessary to manage this type of financial structure. Indeed, during licensing negotiations, Signature informed State Street that any data processing system designed to perform book accounting for a multi-tiered fund based on a partnership portfolio configuration would infringe the '056 Patent. *See* Answer ¶ 12.

In effect, the '056 Patent grants Signature a monopoly on its idea of a multi-tiered partnership portfolio investment structure; patenting an accounting system necessary to carry on a certain type of business is tantamount to a patent on the business itself. Because such abstract ideas are not patentable, either as methods of doing business or as mathematical algorithms, the '056 Patent must fail.

### IV. *Signature's Counter–Claims*

Signature has made two counter-claims under M.G.L. c. 93A: (1) a damages claim against State Street for bringing what Signature alleges to have been frivolous litigation and falsely claiming that its patent was invalid (Count I); and (2) a declaration that State Street is bound by an oral licensing agreement over use of the data processing system (Count II).

■ The Court *sua sponte* may decide issues relating to the scope of its subject-matter jurisdiction. *See* Fed.R.Civ.P. 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the

court shall dismiss the action."). Signature claims that the Court has jurisdiction over these counter-claims pursuant to 28 U.S.C. §§ 1338(b), 1367, and 2201. Sections 2201 and 1338(b) are provisions enabling the Court to grant declaratory relief and granting jurisdiction to assert claims of unfair competition "when joined with a substantial and related claim" under the patent laws. Section 1367 governs the Court's exercise of supplemental jurisdiction.

■ The Court's decision granting State Street's motion for summary judgment necessarily also disposes of the first of Signature's counter-claims. Certainly, no unfair trade practice claim can be maintained based on the frivolity of State Street's declaratory judgment action once State Street's requested relief has been granted. Therefore, this first counter-claim is dismissed.

This ruling dispenses with all claims over which the Court had original jurisdiction. Subject matter jurisdiction was predicated solely on the federal patent claims, and there is no diversity jurisdiction as the parties both have their principle place of business in Massachusetts. Thus, the second counter-claim is before this Court solely under its supplemental jurisdiction. Section 1367 provides that this Court "may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).

Whether declaratory relief should be accorded to Signature based on the validity of an alleged oral license agreement is a question best presented to a state court. At this early stage in the proceedings, when neither party has briefed or presented evidence on this state claim, considerations of judicial economy dictate that the counter-claim be dismissed without prejudice. *See McIntosh v. Antonino,* 71 F.3d 29, 33 n. 3 (1st Cir.1995) (holding that when district court appropriately grants summary judgment on federal claim, it may dismiss remaining supplemental

claims if no legitimate federal question exists).[10]

### V. Conclusion and Order

For the foregoing reasons, the Court holds that the '056 Patent is directed to non-statutory subject matter under § 101 and is therefore invalid. Accordingly, State Street's motion for partial summary judgment (Docket 44–1) is *ALLOWED*. Also for the reasons stated above, Signature's counter-claims are hereby *DISMISSED*—the second one involving the alleged oral licensing system—without prejudice.

10. As neither party has briefed this issue, the Court would entertain a motion for reconsideration as to this disposition of the counter-claims.